103    319
41SC 416

# Shupp et al., Executors of Gaylord, *versus* Gaylord.

A., a testator, made the following bequests:—"Item 1st. I give and bequeath unto my beloved wife, B. . . the sum of five hundred dollars a year. . . the said five hundred dollars to be paid to her yearly in each and every year during her natural life; the first thereof to be paid one year after my decease, and the said yearly payment of five hundred dollars is to be paid out of rents accruing under and from the lease of coal to the Wilkes-Barre Coal and Iron Company, if the said rents fail not to be paid; the same to depend upon the payment of rents under said lease sufficient at least to pay the legacies herein charged thereon, and not to be paid out of or charged on any other part of my estate." Two other legacies were charged upon the said lease, "to be paid yearly so long as the said lease runs and produces rents sufficient at least to pay the legacies herein charged thereon," etc. The will further provided: "The bequests made in the foregoing will, viz., five hundred dollars to my wife, two hundred dollars to the Christian Church, and six hundred dollars to the Trustees of the Christian Church for the benefit of indigent widows, I will and direct shall be paid out only from the rents of the Wilkes-Barre Coal and Iron Co., and to be paid, one-half on the 20th days of January and July in each and every year, and no other part of my estate is charged therewith." The residuary estate was given to his children. The lease was executed by testator and others for the term of 40 years, with a clause of forfeiture, on non-payment of rent, at the option of the lessors. The testator died November 28th 1876. On December 22d, 1877, the lease was declared void by a decree of the circuit court on the application of the lessor, because of non-payment of rents. Payments on account of said lease of rents which had accrued prior to the forfeiture were made in 1878 to testator's executors, amounting to a sum more than sufficient to pay the legacies charged thereon, out of which sum the legacy to B. for the year 1877 was paid. On May 8th 1878, the executors joined in a lease of the tract of land covered by the former lease to other parties at a reduced rental, under which payments were made sufficient to pay the said legacies:

*Held* (by the court below), That the residue of rent collected in 1878 under the original lease, and remaining over after the payment of B.'s legacy for 1877, and not appropriated to other pecuniary legacies, could not be applied to the annual payments on B.'s legacy, which accrued in subsequent years, but belonged to the residuary estate.

*Held further* (by the court below, and affirmed by this court), That the legacy to B. was not extinguished by the forfeiture of the original lease by the decree of the circuit court, but is payable out of the rents of the specific property of the testator made the subject of that lease, if there are sufficient rents produced to pay it.

April 12th 1883. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Error to the Court of Common Pleas of *Luzerne county:* Of July Term 1881, No. 116.

Case stated, wherein Betsey Gaylord was plaintiff and Peter Shupp and Abram Nesbitt, executors of Henderson Gaylord, deceased, were defendants, to determine the question whether

a certain legacy of $500 per annum should be paid to said Betsey Gaylord by the said executors.

The facts agreed upon in the nature of a special verdict were substantially as follows : The testator, Henderson Gaylord, died November 28th 1876, leaving a will, of which the following were the material portions :

Item 1st. I give and bequeath unto my beloved wife, Betsey, the sum of two thousand dollars, to be used by her for the purpose of erecting a dwelling house, if she so desires ; but I leave the use of the said sum discretionary with my said wife. And also the sum of five hundred dollars a year, in addition to the sum of three hundred dollars per annum which she is to receive under our marriage settlement or agreement, recorded in the recorder's office, in and for said county of Luzerne ; the said two thousand dollars to be paid to my said wife one year after my decease, and the said five hundred dollars to be paid to her yearly, in each and every year during her natural life ; the first thereof to be paid one year after my decease, and the said yearly payment of five hundred dollars is to be paid out of rents accruing under and from the lease of coal to The Wilkes-Barre Coal and Iron Company, if the said rents fail not to be paid ; the same to depend upon the payment of rents under said lease, sufficient at least to pay the legacies herein charged thereon, and not to be paid out of or charged on any other part of my estate ; but if my said wife does not survive me, then and in such case the foregoing legacies to her are to be void, and of no effect.

Item 2d. I give and bequeath unto The Christian Church of Plymouth two hundred dollars a year out of the rents accruing under and from the said lease with The Wilkes-Barre Coal and Iron Company, so long as the said lease runs and produces rents sufficient at least to pay the legacies herein charged thereon, to be paid yearly in each and every year while said lease produces rents as aforesaid ; the first to be paid in one year after my decease. . . .

The bequests made in the foregoing will, viz : Five hundred dollars to my wife, two hundred dollars to The Christian Church, and six hundred dollars to the trustees of The Christian Church for the benefit of indigent widows, I will and direct shall be paid out only from the rents of The Wilkes-Barre Coal and Iron Company, and to be paid, one-half on the twentieth days of January and July in each and every year, and no other part of my estate is charged therewith.

The residuary devises were in sevenths of his " estate, real, personal and mixed, that may remain after paying my other bequests," and were made to his six children and the issue of a deceased child.

[Shupp v. Gaylord.]

On January 1st 1874, the testator, then the owner of one fourth part of certain coal lands in Luzerne county, in conjunction with the other owners, made the aforesaid lease to the Wilkes-Barre Coal and Iron Company. The term was for 40 years, " unless the said term be sooner ended under provisions herein after contained, or the merchantable coal on said premises be sooner exhausted and worked out." The lease provided that if the lessee defaulted in its payments of rent for sixty days, " the lessors, their heirs or assigns could declare the term of the lease at an end." The minimum rental under said lease was $50,000 per annum, payable in quarterly payments of $12,500 ; one-fourth of which sum was due to said Gaylord; and the first quarterly installment after the death of said Gaylord became due January 1st 1877.

On February 14th 1877, the Wilkes-Barre Coal and Iron Co. went into the hands of a receiver, and on December 22d 1877, the said lease was declared forfeited by a decree of the circuit court of the United States, on the joint application of Gaylord's executors and the other lessors. Payments on account of said lease of rents which had accrued prior to its forfeiture were made to the executors of Henderson Gaylord, in 1878, under decree of the United States circuit court, amounting in all to the sum of $5,527.65, out of which Betsey Gaylord received the sum of $500, as her yearly payment for 1877.

On May 8th 1878, the executors and the other owners made a lease of the same coal lands to Thomas Beaver and Daniel Edwards for a minimum annual rental of $16,666.67, under which payments have been made to the executors in the year 1878, of $1,629.74; in 1879, of $860.10; in 1880, of $3,849.24.

The estate of said Gaylord is solvent, there being assets, other than the rentals from said leases, sufficient to pay all legacies, other than those charged upon the rentals, as specified in said will.

The case stated provided : " If the court be of the opinion that the said legacy of $500 a year can and should, as matter of law, be paid to said Betsey Gaylord by the said Peter Shupp and Abram Nesbitt, executors, out of the rentals accruing under the lease with Thomas Beaver and Daniel Edwards, or that the balance of the $5,527.65, which became due and was paid in 1877, can be applied to the payment of the said legacy of $500 for the year 1878, and subsequent years, then judgment to be entered for the plaintiff for the sum of $1,500, together with interest, if in the opinion of the court interest should be allowed on said legacy; but if not, then judgment to be entered for the defendants; both parties reserving the right to sue out a writ of error to the supreme court."

7 Outerbridge—21

[Shupp *v.* Gaylord.]

The court entered judgment for the plaintiffs for $1500, with interest thereon, RICE, P. J., filing the following opinion :

I. The annuity for the year 1877 has been paid to the plaintiff out of the rents accruing in that year, but she further claims—and this raises the first question in the case—that the residue of rent collected in the same year and not appropriated to the other pecuniary legacies, is applicable to the annual payments on her legacy accruing in subsequent years. We are quite clearly of the opinion, however, that this was not the intent of the testator, as shown by the language of the particular bequest which we have quoted, and the general plan of his will ; for,

(1st.) It is the yearly payment, and not the vesting of the legacy, which is made to depend on the payment of the accruing rents. The condition, properly read, is not that the legacy shall be paid if the rents fail not to be paid, but that the stipulated sum shall be paid yearly if the rents fail not. The testator evidently had in view a temporary suspension of the payment of rents, which he intended should operate as a temporary suspension of the annual bequest, but it is equally apparent that he did not have in view such a total suspension of the payment of rents during the lifetime of his widow as would make it necessary to accumulate them as a fund, out of which her legacy should be paid.

(2d.) The testator's whole estate is devised by the will, and after paying the pecuniary legacies, the residue passes directly to the residuary legatees, his children and grand-children. There is no provision for the accumulation, investment, or otherwise setting apart of the annual residue of rents as a fund for the payment of the annual bequests to accrue in the future ; for, as we have said, the testator evidently saw no necessity for such a provision ; nor is its vesting in the residuary legatees held in abeyance, or made to depend on any contingency. There is no express power given the executors to collect and receive the rents, and if there is any implied power for the purpose of paying the legacies as they annually fall due, it does not imply the further power to impound the residue, and to withhold it from the residuary legatees, who were equally the natural objects of the testator's bounty until the death of the widow, or the expiration of the term of the particular lease, as security against the possible failure in payment of rents in future years sufficient to pay the annual bequests then falling due. The absence of any provision, such as we have indicated, shows quite clearly that the gifts to the residuary legatees appropriated at once to them any residue of rents accruing and received in any one year after paying, at the most, all arrearages of the specific annual bequests then due. It follows that

the residue of rents for the year 1877, after paying the annual bequest to the widow for the current year, went to the residuary legatees, and did not remain in the hands of the executors as assets for the payment of the annual sums accruing to her in the three subsequent years.

II. The next question is one of much greater difficulty. It arises from this state of facts. The lease to the Wilkes-Barre Coal and Iron Company, referred to in the will, was for the term of forty years from January 1st 1874, " unless the said term be sooner ended under provisions hereinafter contained, or the merchantable coal on said premises is sooner exhausted and worked out." One of the conditions or provisions referred to authorized the lessors, " their heirs or assigns," upon default in payment of rent, " at their option, to declare the term of the lease at an end," etc. In December, 1877, the lessee corporation having been previously placed in the hands of a receiver, the lease was declared forfeited by the circuit court of the United States on the joint application of the executors of the decedent and the other lessors, whose lands were combined with those of the testator in the lease. In the subsequent year the executors made a new lease of the same coal lands to different parties, at a considerably reduced minimum rental, under which they appear to have received enough as rents to pay this and the other legacies; and provided the money thus received is, as matter of law, applicable thereto, judgment is to be entered for the amount of the last three yearly payments. Whether the decree of the circuit court can be attacked directly or indirectly is a question not raised by the facts of the case stated, and we therefore take it for granted that it was a valid decree so far as it concerns this proceeding, and that it effectually wiped out the former lease.

The main question is thus presented, whether the forfeiture and termination of the specified lease by the unimpeached decree of a court of competent jurisdiction had the effect of totally extinguishing the plaintiff's annual legacy. It was not argued that the gift to the plaintiff was intended, in any event, to be a general legacy, nor, strictly speaking, can it be said to be a demonstrative legacy. As to all other parts of his estate, excepting, certainly, the rents, or price of the coal, to be received from the coal then leased to the Wilkes-Barre Coal and Iron Company, the testator intended it to be specific. His intent in this particular is not left to inference, but is clearly, unequivocally, and repeatedly expressed. His words are, " to be paid out of the rents accruing," etc., " if the said rents fail not to be paid," " the same to depend upon the payment of rents," etc., " not to be paid out of or charged on any other part of estate," " shall be paid out only from the rents," etc.,

" and no other part of my estate is charged therewith." These repeated expressions of the testator's will show that this legacy was intended to be charged on some particular part of his estate ; that the object upon which it was charged was not designated for the purpose of furnishing a convenient means of payment ; and that all other parts of his estate were expressly discharged. In Walls *v.* Stewart, 4 H. 275, 281, the distinction between specific and demonstrative legacies *is* thus clearly stated : " If the legacy be given with reference to a particular fund only, as pointing out a convenient mode of payment, it is considered demonstrative, and the legatee will not be disappointed though the fund totally fail. But where the gift is of the fund itself, in whole or in part, or so charged upon the object made subject to it as to show an intent to burden that object alone with the payment, it is esteemed specific, and consequently liable to be adeemed by the alienation or destruction of the object." It is undoubtedly on this account, as much as any other, that courts are averse to construing legacies to be specific, and the intention of the testator that they should be so must be clear, and in the discovery of this intention, the principle having the greatest influence is not that the designated fund is charged with the payment, but that all other portions of the estate are discharged : Balliet's Appeal, 2 H. 451. Judged by these principles, whether the bequest to the plaintiff be regarded as a gift of a part of the rents to be received under the described lease only, or as a gift of mere quantity charged thereon, or as a gift of mere quantity intended to be charged on the coal estate, which was the subject of the described lease, it must be held to be in its nature, if not technically, a specific, and not a general, nor strictly a demonstrative legacy. But, as has been seen, one of the incidents of specific legacies is their liability to be adeemed, and this is not a question of intention. But this does not dispose of the whole question here involved, but brings us face to face with it. " The rule seems to have prevailed in some of the old English cases that the ademption was a question of intention. But all this has been exploded long ago, and no such distinction is taken in the modern cases. It was finally settled that the only rule was to see whether the subject of the bequest remained in specie at the time of the testator's death, for if it did not there was an end of the legacy, no matter how it may have been disposed of :" Hoke *v.* Herman, 9 H. 301. It would seem logically to follow from the principle announced in the case cited, that the ademption of a legacy does not depend on an intent to revoke the gift, to be inferred from any act of the testator, but results, as a rule of law, from a destruction of the thing itself, or the object on which alone the legacy is charged, and that, there-

[Shupp v. Gaylord.]

fore, it may in effect, though not technically, take place on the happening of the event after the testator's death. Arguing from these premises, it is urged by the defendants as an inevitable conclusion that the termination of the described coal lease effectually extinguished the plaintiff's legacy. This supposed effect of the termination of the described lease requires us to examine more particularly the nature of the legacy, and to ascertain, if possible, from the whole will, what was the object on which the testator intended it to be charged. Let it be assumed, then, that an alienation of the estate or fund by the testator, or its destruction by operation of law or otherwise in his lifetime, would have worked an ademption of this legacy, does it necessarily follow, from a fair construction of the whole will, that the testator intended to so charge the particular legacy that the power to extinguish it would be placed in the hands of his beneficiaries who are adverse in interest, and possibly without any diminution in the ability of the estate from which it was ultimately to issue to pay it? If the conclusion contended for by the defendants be correct, then the gift to the plaintiff might have been as effectually revoked by a cancellation of the lease by the voluntary act of the executors and the residuary legatees, for though the forfeiture in the case in hand was under a decree of court, that decree, nevertheless, rested on the exercise of an option by the executors. This lease did not fall in by reason of the default in payment of rents, but by reason of the exercise of this option, to which the circuit court gave effect. If, after a fair construction of the whole will, the effect claimed is that which must legally be given to the forfeiture of the lease, then however monstrous it may seem that the gift to the testator's widow may be made null by the voluntary act of his executors, or of his residuary legatees, who will profit thereby, the court is powerless; for the court is neither authorized to make wills, nor to reform them, but only to construe and give effect to them according to the expressed intent of the testator, if possible. But if the effect claimed here for the forfeiture of the particular lease was not only not in the mind of the testator, but is against his intent, as gathered from the whole will, then we are bound by every consideration of reason and authority to construe the particular expressions from which the effect is claimed to follow in subordination to the testator's general intent. It is said that this is a canon of construction, so universally recognized as sound and just, that it would be mere affectation of learning to cite books in its support: Sharswood, J., in Doebler's Appeal, 14 Sm. 15. In obedience to this just rule, must not the words, "the lease of coal to the Wilkes-Barre Coal and Iron Company," be regarded, not as in itself the object of the charge, but as descriptive only

of the source from which the rents were to issue, upon which the legacy was charged. In this view, the plaintiff's legacy would be regarded as specific, in that the produce in rentals of the coal estate then leased to the company was charged therewith only, and all other parts of the estate were discharged ; and demonstrative, in that the rents or produce of the coal, being primarily and solely charged therewith, the particular lease was referred to as the channel through which they were receivable. Several considerations seem to us to warrant this view of the testator's will.

(1st.) The legacy or annuity is to be paid to the plaintiff during her life. There is no express declaration that it is to cease upon the termination of the lease, and no inferable intention that it should cease short of the term which the lease was to run. In this respect, the language used differs from the language of the bequests to the Christian Church and to the trustees. In the first of these bequests the language is, "so long as the said lease runs and produces rents sufficient at least to pay the legacies herein charged thereon ;" and in the second the language is, "while the said lease produces sufficient rents," etc. What is the proper construction of these latter expressions is a question not before us at this time, and therefore we are not called upon to state their effect. We cannot say, however, that the different language chosen in the bequest to the plaintiff was used accidentally. But whether accidental or intentional, it has a different import, and it is quite clear that the non-payment of rent was not intended to designate a period when the payment of the plaintiff's annuity should cease absolutely, and the words, "if the said rents fail not to be paid," "the same to depend on the payment of rents under said lease," do not particularly refer to the termination of the lease, but at the most to the temporary suspension of the payment of rent—an event, the happening of which was possible under the lease without its termination, or liability to forfeiture, and which, when it should happen, was intended to suspend the payment of the annuity for the time being.

(2d.) There is nothing to indicate that the legacy was charged, or intended to be charged, on the particular coal lease because of any peculiarity in its conditions, nor because of the amount of the minimum therein reserved and required to be paid. That these considerations were not uppermost in the testator's mind is evidence, first, from the fact that there was to be no abatement in the plaintiff's annuity by reason of any diminution in the amount of rents received, the only condition being that enough should be received to pay it; and second, it is only the residue "which may remain after paying my other legacies" that was given to his residuary legatees, thus indicating that

they are to be deferred until after the plaintiff's legacy is fully satisfied. The reiteration of the condition that there should be sufficient rents to pay this legacy shows that, while the testator was particular that no other part of his estate should be charged therewith, the absolute insufficiency of rent was intended to be the only contingency which should suspend or defeat it. That the testator had some purpose in view in the reiteration of his directions in this particular is evident, and we are not at liberty to thwart it, but neither are we at liberty to assume that his purpose was to defeat the gift to his wife, of all others, by charging it on a lease which we knew could not be lived up to, and must be forfeited. If, as is argued, this was such a lease, then, without charging the testator with having resorted to a cunning, which is nowhere apparent, we cannot hold that the inevitable forfeiture of the lease was the event he had in view in his reiterated directions that the payment of the legacy was to depend on the payment of sufficient rent. The fact, then, that the present lease is at a reduced rental does not materially affect the question. It might have been at an increased rental, but no inference could be drawn from that fact that the annuity was intended to increase in proportion to the increase in the rent, nor would it strengthen the plaintiff's right to the annual sum which the testator intended her to have, provided only there were sufficient rent to pay it.

(3d.) But, to repeat, the testator had a purpose which we are to discover, not from a single sentence, but from his whole will, and that the lease was referred to for the purpose of describing and identifying the fund out of which this legacy was to be paid, and that the fund thus designated was in his mind, the produce of the coal estate then under lease is further evidenced by the last clause in the will, which is presumed to contain the final expression of his intention, and in the light of which all that has gone before is to be read. The words are, " shall be paid out only from the rents of the Wilkes-Barre Coal and Iron Company, and no other part of my estate is charged therewith." Take this sentence literally, and it means rents paid by the Wilkes-Barre Coal and Iron Company, and in this sense the corporation to pay the rents was the primary thought, and the land or other estate from which they were to issue was secondary, if not immaterial. But if it is taken in the evident sense of the testator, it means that the rents of some particular land, coal, or other estate then under lease to the company are the subject of the charge ; the name of the lessee is used in the place of the property itself, as if the testator had said rents of the Wilkes-Barre Coal and Iron Company property, and the lease then in force was regarded as merely the channel through which the rents were receivable.

(4th.) If any inference is to be drawn from the testator's direction, that the legacy is not to be paid out of or charged on any other part of his estate, it is favorable to the view which we have taken. The will shows that the testator left personal property and other real estate, which the executors were directed to sell. It was quite natural that he should be particular in discharging this other part of his estate from this legacy. So, too, keeping in view all the time his general intention that the annuity should be paid each year, provided only that sufficient rents should be received to pay it, it is quite evident that he rested confidently in the belief that the fund would not permanently fail, although he of course knew that the particular lease referred to was liable to be changed, modified, and even forfeited. He knew, also, that in this region the coal and surface are often sold and otherwise made available as though they were separate estates, and foresaw the time when it might be desirable, and to the advantage of his children and grandchildren, to dispose of the surface free from all charges and incumbrances. For aught we know, the latter may already have been so disposed of by contract or otherwise in his lifetime. However this may have been, it was natural, believing, as he did, that he had already made abundant provision for this legacy, and having in mind the availability of the surface as distinct from the coal, that he should direct particularly it should be paid only out of the rents and profits of the coal estate referred to, and that all other parts of his estate should be discharged. If we have correctly interpreted the testator's purpose in this particular, and the motives which guided him in his restrictions as to the source from which the legacy was to come, we are justified in concluding that the testator meant by the terms "no other part of my estate," no other part of his estate except that then under lease. This construction is quite as reasonable as to suppose that the testator mistakenly regarded the lease as such, as a part of his estate separate and distinct from the reversion, and in contradistinction to the land or coal on which it was charged, and will give effect to his whole will, while the latter will not; for if, as is argued, the fee went to the residuary legatees, the lease went with it, in the absence of specific devise otherwise. As the owners of the fee, they were entitled to the rents, either directly or indirectly, through the executors, subject, it is true, to the charge of the specific legacies. But if, by a discharge of all other parts of his estate, the testator had in view not only his personal estate, his other real estate, and the surface of the lands under lease, but also the coal, which was the subject of the lease, and all rents to issue therefrom, except through the described channel, then a termination of the described lease, not by any act of the

[Shupp v. Gaylord.]

testator, nor by necessary operation of law, nor by failure of title to the land, nor by the expiration of the term, nor by the exhaustion of the coal, but by the voluntary act of the executors, or of the residuary legatees, who would profit thereby, either in taking advantage of a technical default in the payment of rents, or accepting a surrender from the lessees, would close up the source of the plaintiff's annuity, and thus defeat the testator's evident intention to provide for her a sure, if not abundant, income during her natural life. We think it reasonable to say, that because a construction of the words, " no other part of my estate," etc., would defeat the gift in reference to which they are used, the very indefiniteness of the terms furnishes negative evidence at least that they were not intended to include the only sure source from which the legacy could be paid.

We conclude, that the plaintiff's legacy was not adeemed, or, more properly speaking, extinguished by the forfeiture of the lease, as set forth in the case stated, but is payable out of the rents of the estate of the testator made the subject of that lease, provided sufficient rents are produced to pay it. We are free to say that we do not feel confident that we have as adequately as they deserve met and answered the argument of the eminent counsel who urged the opposite conclusion ; but, on the other hand, after a careful consideration of the whole will taken together, we are satisfied that our conclusion carries out the intent of the testator as disclosed by its terms, and that no other conclusion would.

III. As we understand the terms of the case stated, the main issue is as to the right of the plaintiff to recover her legacy, notwithstanding the forfeiture of the lease. There is no formal plea of want of assets, and if there were, the main issue would properly be determined first, and the secondary question could be raised on an application to stay execution until proceedings were had in the Orphans' Court: Act of February 24, 1834, sec. 54, P. L. 83, P. D. 449, pl. 219 ; Breden v. Gilliland, 17 Sm. 34. In this view of the case stated, and with this understanding of the issue, we will enter judgment for the plaintiff, and if it is desired to raise the question of jurisdiction it may be done on a motion for stay of proceedings.

And now, July 12th 1881, judgment is entered for the plaintiff for the sum of fifteen hundred dollars, with interest on each semi-annual installment from the time it was payable under the terms of the will : the dates when such semi-annual installments were payable being January 20th and July 20th in the years 1878, 1879 and 1880 ; the amount to be computed by the prothonotary.

The defendants took this writ of error, assigning for error the entry of judgment for the plaintiff.

*J. Vaughan Darling* and *A. T. McClintock* (with them *E. P. Darling*), for the plaintiffs in error.

*Geo. K. Powell*, for the defendant in error.

Mr. Justice STERRETT delivered the opinion of the court, May 25th 1883.

The questions involved in the case stated have been so elaborately discussed by the learned president of the common pleas that it is unnecessary for us to do more than affirm the judgment for the reasons so clearly and forcibly presented in his opinion.

In the language of the testator, the additional bequest of " five hundred dollars a year," to his wife is " to be paid to her yearly, in each and every year during her natural life, . . . out of the rents accruing under and from the lease of coal to the Wilkes-Barre Coal and Iron Company, if the said rents fail not to be paid ; the same to depend upon the payment of rents under said lease sufficient at least to pay the legacies herein charged thereon, and not to be paid out of or charged on any other part of my estate." The coal referred to was then leased for a term of years ending January 1st 1914. The product of that coal property, in the shape of annually accruing rents, was manifestly the fund out of which the testator intended the annuity to be paid, and upon which, exclusively and in relief of every other part of his estate, it is by necessary implication charged. The then existing lease and the name of the lessee are mentioned merely as descriptive of the property whence the income was to be derived with which the annuity charged thereon should be paid ; or, in the language of the court below, " the lease of coal to the Wilkes-Barre Coal and Iron Company " must be regarded, not as in itself the object of the charge, but as descriptive only of the source from which the rents were to issue upon which the legacy was charged. The only contingencies in which the testator appears to have contemplated even a temporary suspension or cessation of the annuity, or any part thereof, are the failure of rents or income from that particular property, or such decrease in the amount of income as would render it insufficient to pay the legacies charged thereon. But, as has already been suggested, the reasons given in support of the judgment are entirely satisfactory and need not be repeated.

Judgment affirmed.